May it please the court, my name is Michael Gillette. I'm appearing on behalf of the Dieringer estate in this charitable donation matter. The court's questions to counsel in the earlier cases demonstrate that the court has read the briefing carefully and so I will try to avoid repeating what I've said in the brief and offer myself mostly to answer questions after this hopefully permissible introductory set of remarks. The question here is whether the value of the bequest to the charities in this case is to be established as of the date of the death of the testator or whether instead is to be established at some later date. The problem with the government position is that while the government argues for a later date, there is no principled basis that the government offers which would permit us to figure out what date that would be. At least with respect to this to the precedent that we've cited, which comes from most of the circuits and includes the probstra and other cases from this circuit, the general understanding has been that with bequests of this kind, the value of the charitable contribution is to be determined at the time of the death of the testator or testatrix in this case. And you've got is you've got two appraisals basically that came out within a day of each other, appraising it completely differently. I mean, that's what you've got. Your Honor, I need to point out a truism here which doesn't leap out at one, but you need to recognize. The appraisals were of the particular matters at two different times. They came out essentially the same day because the same person performed both of them. And he was told to value them differently. Right. But the fact that they came out They set off some red flags. Of what? For the IRS. I guess the question becomes of what? Because if it's an indication Of manipulating the system somehow? Well, let's back up just a step from that. The decision of the tax court, part of which we lost, but the decision of the tax court on the facts indicates that what was actually done eventually, it was not part of the testator's plan. It was not something that had been written down ahead of time. And indeed, her death occurred several years after the trust instrument had first been devised. And then the decision was taken later for valid tax reasons, as the trial court concluded, to change to a subchapter S corporation. The difference in the valuation may not be explainable. But why that is attributable to the estate is what's missing in the government's argument. Don't you have, Eugene Derringer is the trustee? Yes. Is the principal person across the trust, the foundation, and the business? Correct. And I'm not quite sure what comes of that, though, Your Honor, because ordinarily speaking, when one establishes a trust, one picks someone that someone trusts. And under the circumstances, when Eugene was directly involved in operating the business, the Derringer. Well, the way it was, the way, I grant you that, but the way all these entities were structured, it did allow for Eugene Derringer to accomplish what he did. Well, first of all, I don't know that what he accomplished was impermissible. But let me point out to you, with respect, Your Honor, that that authority exists for every trustee. There was nothing peculiar about Eugene Derringer's trustee authority under the trust instrument. He had only the powers that a trustee normally has under Oregon law, and the obligation he had was to preserve the value of the trust estate. If he has failed in that regard, there may be remedies both for the ultimate recipient of the bequest, and there may even be remedies for the IRS in terms of trying to figure out what value he got out of that and treating that as income and asking him to pay income tax on it. But that doesn't, that doesn't at all, I respectfully submit, change the fact that if this is an open door. So when he structured this, or he and his brother and the other principal trustee, I forget his name, when they reshaped the business from a C to an S corporation, they were, he was acting in his, I don't know, fiduciary capacity towards the corporation? Yes. Is that what was going on? Yes. He was the trustee. He was acting in a fiduciary capacity. And, in fact, so was everybody else with respect to that choice. With respect to the corporation? Yes. If I understand Your Honor's question correctly, the answer is yes. So he has different, he had different roles. That is, I mean, he was a trustee, he was a key person in each one of these entities, but he had separate sort of like duties to each one of these entities. Is that right? Duties is the correct word, not roles. He was a trustee everywhere. Well, duties. But he had separate duties, but they all came down to the same thing. They all came down to a requirement that he preserve that asset to the extent it was And if he made a mistake with respect to that, as the tax court appeared to think that he did, if he made a mistake with respect to that, he may be responsible, as I said, to the beneficiaries. But his was, that was not an act of the estate. So let me, I'm trying to get something straight. If you have the value at the date of death, which is the, how it's generally accepted to be, in this case, the stock was valued as a majority interest, correct? Correct. The stock was valued in two pieces, one for voting stock and the other for. And for the non-voting stock. But it was valued as a majority interest, yes. And was there also a discount taken at that time for the fact that it was a closely held corporation, for example? There was a 5% discount to the non-voting stock as a reflection of the fact that it was non-voting stock. Okay. Because normally, at least in cases I've seen often in these closely held corporations, you take a bigger haircut because of the nature of the holding of the stock. But that just didn't happen here. And so if the, if it were determined that the date of valuation should be the date of death, has that ship passed on how the stock is valued? Do you see what I'm saying? I don't. Well, if it's determined that the date of death is the date of valuation, is the valuation that was given what is firmly established now, or is that still subject to attack by the IRS because it was a majority interest and there wasn't a bigger haircut? The IRS specifically conceded that there was no argument with respect to the valuation as of that date. And so then everything that happened after that date is something that Eugene did in terms of restructuring and valuation as a result of the restructuring, correct? Yes. But it was not something he was instructed to do in the testament or any other thing. Exactly. So then the question I have is this issue that I think my panel, co-panelists are kind of getting at, is there does seem to be this lurking conflict or dealing here. Is the penalty for self-dealing something that could, if the stock is valued as of the date of death, could the penalty for self-dealing still be imposed at this point vis-à-vis? On Eugene? On Eugene. That involves a question of notice, statute of limitations and other things that lies well beyond my brief. All right. That's fine. In both the literal and the. . . Okay. Let me. . . We'll just say unknown. Let me ask you this. Would it be a fair if somewhat simplistic analogy to say the estate has a house and six months later the heirs trash the house, but you still value the house as of the date of the death, not as of the date that the house was trashed? With respect, Your Honor, that's precisely the point. And if I may, I'd like to save 45 seconds. Sorry. You may. Thank you. Good morning, Your Honors. Douglas Rennie for the Commissioner of Internal Revenue. Your Honors, the issue in this case is whether the estate can take a charitable deduction for the value of a controlling stake in a company where the charity actually receives entirely different, less valuable assets,  where the charity actually receives entirely different, less valuable assets. Specifically, as Your Honors have alluded to already this morning, what happened here was that the estate valued the controlling stake in the company at over $13 million and transferred only $7 million in other assets to the charity. Meanwhile, control of the company went to Mr. Eugene Derringer and his brothers. At the time, of course, as Judge Paez was pointing out, Mr. Derringer was the executor of the estate. He was the trustee of the trust. He was the trustee of the foundation. And he was the president of the company. But wasn't the real problem that the DPI redemption valued the stocks as a minority interest and thus undervalued the stocks as opposed to the estate overvaluing the stocks? That is the key factual problem in the case, Your Honor, yes. And part of the factual dispute below, the main focus was on what caused this change in the valuation. So under your interpretation, how far in the future can we look? I mean, five years down the road if they do something? I mean, if you don't cut it off as of the date of death, what factors do you look at and how far? When do you value it? We're just looking at when the charity received it at the time they received it. And here that was when they, I believe, in January of 2011. But how does the receipt date square with Ithaca Trust, which tells you that the value of the estate is the date of death? Your Honor, the Ithaca Trust line of cases, they're primarily talking about situations where you have a donation to a life beneficiary, for example, a widow, a daughter, a son, and then the remainder goes to the charity after they die. So the question comes up, how do you value these things? And for those purposes, the Ithaca Trust line of cases stand for the point we're going to go with the date of death. It's a bright-line rule. It's clean, easy to follow, instead of second-guessing things down the line at various points you could have. But there's never a question in these cases of the charity not receiving the interest that it was supposed to receive under the wills. It's always going to receive that residuary interest. And on this point, I think this Court's decision in a state of shed really clarifies how this should apply here, because it was — in that case, there's a — the decedent's estate had claimed a credit for tax payments made by her husband's estate. There was a change in the law. The payment was refunded. The decedent's estate still tried to claim the credit, and the Commissioner disallowed it. Now, the decedent's estate argued that Ithaca Trust applied, and they argued that death freezes the estate's tax obligation, and any credit she was entitled to as of the date of her death should be allowed without regard to subsequent events. This Court rejected that argument. It said, Ithaca Trust's statements are not formulations of immutable principle, but simply statements of the understanding of the courts that the general intention of Congress is that the Federal estate tax shall be computed on the basis of the estate's value at the moment of the taxable event, i.e., death. But Congress did not intend to make events at the date of death invariably determinative in computing the Federal estate tax obligation. And when it appears that the intent of Congress will be served by considering events subsequent to death for this purpose, the courts have not hesitated to do so. And we would submit that this is one of those instances, Your Honor, when you look at other cases such as Sages Estate and Amundsen, which talk about the principle that you can't take a deduction for more than the charity is actually receiving. One of the things that seems to really distinguish Amundsen is that the testamentary plan was what played out and reduced the value. And here we don't have that. We only have a straight-up donation. So I can't really see that we can take Amundsen in cases where actually the decedent kind of set out and outlined the plan that ultimately resulted in the diminution in value. So beyond Amundsen, what's your best case in that sort of line of thinking? That would be Sages Estate, Your Honor. Okay. And that's the case where the decedent had left the residue of his estate to a Scottish lord for charitable purposes. The widow then came in and contested the husband's will. The lord then, essentially the charity, settled the claim after he received the money for those charitable purposes. So it wasn't the estate or executor coming in and settling it there. And so in those circumstances, even though the estate then claimed 100 percent of the residue that went to the lord, the commissioner said, no, you have to discount that 25 percent. And the Third Circuit agreed in that case. And so Sages Estate and its progeny stand for the proposition that the amount to be deducted for testamentary charitable gifts must be computed on the basis of what the charity actually received. So it did take into consideration events. But wasn't — isn't that case also a little bit like Amundsen in that the testamentary plan permitted these various actions? So it all kind of stems back to the testamentary plan. And so the commissioner would be justified in saying, well, we're going to not let that jigger the value of the deduction or the transfer. And we just don't have those kind of provisos in the plan here. So I see Sage as kind of a variation on Amundsen, but maybe you can tell me why it's not. Well, Your Honor, that actually was not provided for in the testamentary plan. The testamentary plan was that everything was supposed to go to the Scottish Lord for the purposes of charity. It was the Lord or essentially the charity then after the fact that went back and said, okay, we're going to cut a deal with the widow. And so that shift actually occurred later. And I would also point out that it's not — But I thought — I thought also, and again, there's so many cases and different circumstances, but I thought the situation in Sage was such that it then resulted in a treasury regulation that basically encapsulated that whole notion. But that doesn't — that treasury regulation is not really what applies here. Is that right? We disagree with that, Your Honor. All right. Our position is that the regulation does apply here. 20.2055? Yes, Your Honor. And so that regulation limits a charitable deduction if the trustees empower to divert assets. So the question here is whether the trustee has that power in the — But if he's empowered to divert assets, the way you would get that power would be from the testamentary document, isn't it? It would be from the estate plan, which here wasn't just the trust agreement. It was the fact that Mr. Derringer was the executive of the will. He was the trustee of the trust. He's the trustee of the foundation. He's the president of the company. And if you look back at some of the documents in the record, going back to his attorney's memo, Mr. Kerstens, from 2000, it said that the whole idea behind this estate plan was to allow Mr. Derringer, Eugene, to, quote, control the process. And that's at excerpts of Record 290. So this is really a situation where it's not just that Eugene Derringer is wearing more than one hat. He's wearing all the hats here, Your Honor. His mother, the decedent, gave him total control over this process. Let me ask you the question that I asked your colleague here. If it were determined that the value is the date of death, is there any option that the service still has vis-à-vis kind of the self-dealing penalty and Eugene? Or is that an option that's already been waived or otherwise thrown out? It's possible, Your Honor. We don't really have that in the record in this case. But as a matter of statutory applicability, would it be potentially applicable to him? Possibly, Your Honor. It does appear from the record we do have information saying that they were attempting to comply with those regulations. We have the application to the local probate court in that regard, Your Honor. Thank you. Let me ask you this. The estate plan, the document itself, it didn't provide for Eugene to be the president of the corporation, did it? That's correct, Your Honor. Or president of the foundation or the trustee of the foundation, did it? Which documentary are you referring to? The testamentary documents. The will. The will. It didn't provide, it didn't say he's to be chairman or whatever, president of the foundation, did it? I don't believe, I think the will just basically made him. When you were describing his role, you said that, you said the testamentary plan here is broader than, effectively what you said was broader than just the documents itself, because he was in all these key positions. Essentially, Your Honor, we're saying if you, sorry. Does that mean, is that the essence of your point? Yes. Which is that he is, he's key throughout all of this. Exactly, Your Honor. Yes, that's our point. It's that you have to consider the fact that he had all these positions in the various documents that made up the estate plan and was already the president of the company. And I see him over time, so if Your Honors have no further questions, we'll rest our brief. Thank you. Thank you. If the Court please, and I will talk more rapidly than I would prefer, but Your Honor's question with respect to the Amundsen and Sage cases, is precisely the point with respect to why they are not of any particular value to the government. I'm vexed by the government's insistence that the regulation applies at excerpt 52 of the record, which is noted at footnote two, page two of our brief. The IRS had indicated it wasn't claiming that the reg applied. So I'd like them to at least be consistent about that. Beyond that, the rest of the point is made by the last question put by Judge Paez. This situation is a commonplace in closely held corporations, and you would wipe out an awful lot of permissible things if you say the mere fact that the person who has always been in charge continues to be in charge with a legal obligation to preserve the race of the trust for the ultimate beneficiary. If that fact opens up this discussion, then we'll never be finished. Okay. All right. Thank you. Thank you. Thank both of you for both the briefing and the argument here. Derringer v. Commissioner of Internal Revenue is submitted.
judges: McKeown, Paez, Bashant